# IN THE
# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## FOR THE SEVENTH CIRCUIT

―――――――――

F.F., a minor, by and through her next friend and
father, JAMES ELLARD FISHER, individually,
and on behalf of all others similarly situated,

*Plaintiffs-Appellants*,

v.

VALLEY VIEW COMMUNITY
UNIT SCHOOL DISTRICT 365U, *et al.,*

*Defendants-Appellees.*

―――――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION
Case No. 1:25-cv-9112
The Honorable Judge Sharon Johnson Coleman

―――――――――

## BRIEF AND REQUIRED SHORT APPENDIX
## OF PLAINTIFFS-APPELLANTS

―――――――――

Ajay Gupta
The Law Offices of Ajay Gupta
2849 Bond Circle
Naperville, IL 60563
630-854-7194
ajguptaemail@gmail.com

*Counsel for Plaintiffs-Appellants*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>25-2735</u>

Short Caption: <u>F. F. *et al.* v. Valley View Community Unit School District No. 365U, *et al.*</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    <u>F.F., a minor, by and through her next friend and father, JAMES ELLARD FISHER, individually,</u>

    <u>and on behalf of all others similarly situated.</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    <u>The Law Offices of Ajay Gupta</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and
          N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
          N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
    N/A

Attorney's Signature: <u>/s/ Ajay Gupta</u>        Date: <u>October 15, 2025</u>

Attorney's Printed Name: <u>Ajay Gupta</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** <u>X</u>    **No**

Address:  <u>2849 Bond Circle</u>

       <u>Naperville, Illinois 60563</u>

Phone Number: <u>(630) 854-7194</u>    Fax Number:

E-Mail Address: <u>ajguptaemail@gmail.com</u>

<div align="right">rev. 12/19 AK</div>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ......................................................... 1

STATEMENT OF THE ISSUES ............................................................ 3

STATEMENT OF THE CASE ............................................................... 4

    I.     Factual Background ..................................................................... 4

    II.    Procedural Background ................................................................ 5

SUMMARY OF ARGUMENT .............................................................. 8

STANDARD OF REVIEW .................................................................. 10

ARGUMENT .................................................................................... 12

    I.     The District Court Erred in Accepting the Conclusory Label "Transgender" Without Requiring Objective Criteria, Voiding Its Evaluation of Plaintiffs' Likelihood of Success. ........................ 12

        A.  At Defendants' Urging, the District Court Stripped the Term "Transgender" of All Meaning. ............................................. 13

        B.  The District Court Disregarded Evidence and Arguments Highlighting the Inaptness of the Term "Transgender" With Respect to Defendants' Policy. ............................................. 15

    II.    The District Court Erred in Relying on Non-Binding Illinois Guidance to Justify Defendants' Policy, Which Lacks Objective Criteria and Violates Federal Law. ............................................. 20

        A.  The IDHR Guidance Does Not Support Defendants' Policy Lacking Objective Criteria. ..................................................... 20

        B.  Non-Binding IDHR Guidance Cannot Override Federal Constitutional and Statutory Violations. ................................. 22

        C.  The Policy's Overreach Harms Female Students and Supports Injunctive Relief .................................................................. 23

    III.   The District Court Erred in Accepting Defendants' Misapprehension of this Court's Precedent That Schools Have Unfettered Discretion to Define Transgender Status Without Objective Criteria. ...................... 24

    A. Martinsville Does Not Grant Schools Unlimited Discretion to Forgo Objective Criteria. ...................................................... 24

    B. The Lack of Objective Criteria Violates the Equal Protection Clause. ................................................................................. 26

    C. The Lack of Objective Criteria Violates Title IX. ................. 27

    D. The Error Supports Reversal of the Preliminary Injunction Denial. .... 28

IV.   The District Court Erred in Mischaracterizing F.F.'s Privacy Concerns as Solely Related to Sexual Interest, Ignoring Established Privacy Interests in Sex-Separated Facilities. ........................................... 28

    A. The District Court Mischaracterized F.F.'s Privacy Concerns as Sexual in Nature. .................................................................. 29

    B. Sex-Separated Facilities Protect Broad Privacy Interests, Not Just Sexual Privacy. ....................................................... 30

    C. The Mischaracterization Undermined the Preliminary Injunction Analysis. .............................................................. 32

V.    Plaintiffs Are Substantially Likely to Prevail on the Merits. ...................... 33

    A. Defendants' Policy Violates the Equal Protection Clause. ................... 34

    B. Defendants' Policy Violates Title IX. .................................... 40

VI.   The District Court Erred in Determining No Irreparable Harm. ............. 42

VII.  The District Court Erred in Finding an Adequate Remedy at Law. ......... 45

VIII. The Balance of Equities and Public Interest Favors an Injunction. ........... 48

CONCLUSION ................................................................................. 49

CERTIFICATE OF COMPLIANCE ....................................................... 51

CERTIFICATE OF SERVICE ................................................................ 52

CIRCUIT RULE 30(d) STATEMENT ................................................... 53

REQUIRED SHORT APPENDIX

# TABLE OF AUTHORITIES

**Cases**

*A.C. by M.C. v. Metro. Sch. Dist. of Martinsville,*
 75 F.4th 760 (7th Cir. 2023) ............................................................ *passim*

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.,*
 57 F.4th 791 (11th Cir. 2022) ........................................................... *passim*

*Brannum v. Overton Cnty. Sch. Bd.,*
 516 F.3d 489 (6th Cir. 2008) ................................................................... 31

*Canedy v. Boardman,*
 16 F.3d 183 (7th Cir. 1994) ..................................................................... 31

*Chaney v. Plainfield Healthcare Ctr.,*
 612 F.3d 908 (7th Cir. 2010) ................................................................... 31

*Christensen v. Harris County,*
 529 U.S. 576 (2000)................................................................................. 22

*City of Cleburne v. Cleburne Living Ctr.,*
 473 U.S. 432 (1985) (citing *Plyler v. Doe*, 457 U.S. 202 (1982)) ............ 34

*D.P. by A.B. v. Mukwonago Area Sch. Dist.,*
 No. 23-2568, 2025 WL 1794428 (7th Cir. June 30, 2025) .................... 34

*D.U. v. Rhoades,*
 825 F.3d 331 (7th Cir. 2016) ................................................................... 10

*Davis v. Monroe Cty. Bd. of Educ.,*
 526 U.S. 629 (1999)................................................................................. 40

*Doe v. Purdue Univ.,*
 928 F.3d 652 (7th Cir. 2019) ................................................................... 28

*Fed. Trade Comm'n v. Advocate Health Care Network,*
  841 F.3d 460 (7th Cir. 2016) ............................................................ 10

*Foodcomm Int'l v. Barry,*
  328 F.3d 300 (7th Cir. 2003) ....................................................... 46, 47

*Fortner v. Thomas,*
  983 F.2d 1024 (11th Cir. 1993)
  (quoting *Lee v. Downs,* 641 F.2d 1117 (4th Cir. 1981)) ........................ 31

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of United States of Am., Inc.,*
  549 F.3d 1079 (7th Cir. 2008) (quoting *Roland Mach. Co. v. Dresser Indus., Inc.,*
  749 F.2d 380 (7th Cir. 1984)) .................................................... 10, 43

*Harris v. Miller,*
  818 F.3d 49 (2d Cir. 2016) .............................................................. 31

*Illinois Dep't of Revenue v. Illinois Civ. Serv. Comm'n,*
  357 Ill. App. 3d 352, 827 N.E.2d 960 (2005) ...................................... 22

*Illinois Republican Party v. Pritzker,*
  973 F.3d 760 (7th Cir. 2020) ...................................................... 11, 14

*Joelner v. Vill. of Wash. Park,*
  378 F.3d 613 (7th Cir. 2004) ......................................... 24, 28, 32, 48

*Jones v. Markiewicz-Qualkinbush,*
  842 F.3d 1053 (7th Cir. 2016) .................................................... 10, 11

*Michigan v. U.S. Army Corps of Eng'rs,*
  667 F.3d 765 (7th Cir. 2011) ....................................... 42, 44, 45

*Promatek Indus., Ltd. v. Equitrac Corp.,*
  300 F.3d 808 (7th Cir. 2002) ........................................................... 45

*San Antonio Indep. School Dist. v. Rodriguez,*
  411 U.S. 1 (1973) ......................................................................... 23

*Soule v. Connecticut Ass'n of Sch.,*
    755 F. Supp. 3d 172 (D. Conn. 2024) ................................. 23

*Turnell v. CentiMark Corp.,*
    796 F.3d 656 (7th Cir. 2015) ..................................... 10, 11

*United States v. Fenner,*
    140 F.4th 826 (7th Cir. 2025) ........................................ 34

*United States v. Skrmetti,*
    145 S. Ct. 1816 (2025) ............................................... 33

*United States v. Virginia,*
    518 U.S. 515 (1996) .............................................. *passim*

*Vill. of Willowbrook v. Olech,*
    528 U.S. 562 (2000) .................................................. 34

*W. Air Lines, Inc. v. Flight Eng'rs Int'l Ass'n,*
    194 F. Supp. 90 (S.D. Cal. 1961) .................................... 13

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,*
    858 F.3d 1034 (7th Cir. 2017) ................................... *passim*

*William v. San Francisco Unified Sch. Dist.,*
    340 F. Supp. 438 (N.D. Cal. 1972) .................................. 13

**Statutes**

20 U.S.C. § 1681 ............................................... 15, 27, 40

20 U.S.C. §§ 1681–1688 ............................................ 1, 3, 6

28 U.S.C. § 1292 ..................................................... 1

28 U.S.C. § 1331 ..................................................... 1

28 U.S.C. § 1343 ................................................................................... 1

28 U.S.C. § 2201 ................................................................................... 1

28 U.S.C. § 2202 ................................................................................... 1

42 U.S.C. § 1983 ................................................................................... 1

42 U.S.C. § 1988 ................................................................................... 1

## Rules

Federal Rule of Appellate Procedure 4 ........................................................ 1

Federal Rules of Civil Procedure 57 ........................................................... 1

Federal Rules of Civil Procedure 65 ........................................................... 1

## Other Authorities

B. Sadock, V. Sadock, & P. Ruiz, Comprehensive Textbook of Psychiatry 2063 (9th ed. 2009) ............................................................................................. 18

# JURISDICTIONAL STATEMENT

This is an appeal from a decision of the United States District Court for the Northern District of Illinois, Eastern Division, Judge Sharon Johnson Coleman, denying plaintiffs' motion for a preliminary injunction.

Because the underlying action arises under 42 U.S.C. §§ 1983 and 1988 for alleged violations of the Equal Protection Clause of the Fourteenth Amendment and under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688, the district court had original jurisdiction over it pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343(a)(3) and (4) (civil rights jurisdiction).

The district court also had authority to issue declaratory and injunctive relief under Federal Rules of Civil Procedure 57 and 65, 28 U.S.C. §§ 2201 and 2202, and its inherent equitable powers.

This Court has jurisdiction over this appeal under 28 U.S.C. § 1292(a)(1), which grants appellate jurisdiction over interlocutory orders of the district court denying injunctions.

The district court denied plaintiffs' motion for a preliminary injunction on September 30, 2025. (ECF 27, Mem. Op.). Plaintiffs filed a timely notice of appeal on the same day, September 30, 2025 (ECF 28, Pls.' Not. App.), within the 30-day period prescribed by Federal Rule of Appellate Procedure 4(a)(1)(A).

There are no prior or related appellate proceedings in this case. (ECF 29, Pls.'
Dock. Stmt. at 1).

# STATEMENT OF THE ISSUES

Did the district court err in denying plaintiffs a preliminary injunction against defendants' policy of allowing biological male students access to female-only restrooms, locker rooms, changing rooms, and showers at Bolingbrook High School, in Bolingbrook, Illinois, based solely on self-declared gender preferences without assessing or even considering objective criteria?

Specifically, did the district court err in:

(1)     Holding that defendants' policy is unlikely to constitute a violation of the Equal Protection Clause of the Fourteenth Amendment?

(2)     Concluding that defendants' policy is unlikely to constitute sex-based discrimination or result in a hostile educational environment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688?

(3)     Determining no irreparable harm would ensue from a denial of preliminary injunctive relief to plaintiffs?

(4)     Finding adequate remedies exist even in the absence of a preliminary injunction?

(5)     Balancing harm to plaintiffs from a denial of the preliminary injunction against any harm to defendants and the public from granting it?

# STATEMENT OF THE CASE

## I. Factual Background

Plaintiff F.F. is a 17-year-old female senior at Bolingbrook High School in Bolingbrook, Illinois, operated by the Valley View Community Unit School District 365U (the "School District"). (ECF 1, Compl. ¶¶ 1, 16). On November 4, 2024, at approximately 10:00 a.m., F.F. entered a girls' multi-use restroom labeled "girls' bathroom" at the school. (ECF 27, Mem. Op. at 2). After using and exiting a toilet stall, F.F. encountered a male student, known to her as a male, standing near the stall door. (*Id.*; ECF 12, Ex. 1, F.F. Decl. ¶ 3). F.F. observed that the student wore "typical male clothing" and exhibited "no outward appearance or indication of presenting as female." (ECF 12, Ex. 1, F.F. Decl. ¶ 3). F.F. noted wide gaps on either side of the stall door and a large space beneath it, leading her to fear that the male student could have seen her undergarments or exposed body while she was in the stall. (ECF 1, Compl. ¶ 2; ECF 27, Mem. Op. at 2). F.F. experienced intense anxiety, discomfort, and shame. (ECF 27, Mem. Op. at 2; ECF 12, Ex. 1, F.F. Decl. Decl. ¶ 4; ECF 12, Ex. 2, J. Fisher Decl. ¶ 4).

On November 6, 2024, F.F. informed her father, James Ellard Fisher, of the incident. (ECF 12, Ex. 2, J. Fisher Decl. ¶ 4). The next day, Mr. Fisher contacted Dr. Jason Pascavage, Principal of Bolingbrook High School, via text message to raise

concerns about F.F.'s privacy. (*Id.* ¶ 5). Dr. Pascavage responded that the male student had access to the girls' restroom pursuant to an Individual Development Plan and offered F.F. access to single-use staff restrooms. (*Id.* ¶¶ 5, 6). On November 12, 2024, during an in-person meeting, Dr. Pascavage explained that the School District's policy followed the Illinois Department of Human Rights' 2021 guidance on protections for transgender, nonbinary, and gender-nonconforming students. (*Id.* ¶ 7; ECF 27, Mem. Op. at 2–3). He informed Mr. Fisher that the policy allows students to access restrooms, locker rooms, changing rooms, and showers based on their self-declared gender preferences without requiring objective assessment or evidence of gender identity. (ECF 12, Ex. 2, J. Fisher Decl. ¶¶ 7, 12, 18).

## II.     Procedural Background

On August 1, 2025, F.F., through her father and next friend, James Ellard Fisher, filed a class-action complaint in the United States District Court for the Northern District of Illinois, Eastern Division, against the School District and against Dr. Keith Wood, Superintendent of Schools for the School District, and Dr. Pascavage, each in his official capacity. (ECF 1, Compl.). The proposed class compromises all female students at Bolingbrook High School—over 1,600 in number. (*Id.* ¶¶ 18, 29). The complaint alleges that defendants' policy violates (1) the Equal Protection Clause of the Fourteenth Amendment by discriminating on the basis of

sex and (2) Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688, by creating a hostile educational environment and compromising female students' privacy and safety. (*Id.* ¶¶ 63–78). The complaint seeks declaratory and injunctive relief and nominal damages. (*Id.* ¶¶ 14, 70, 78).

On August 12, 2025, plaintiffs moved for a temporary restraining order (TRO) and preliminary injunction to enjoin defendants from enforcing their policy, supported by declarations from F.F. and Mr. Fisher. (ECF 12, Pls.' Mot.; ECF 12, Ex. 1, F.F. Decl.; ECF 12, Ex. 2, J. Fisher Decl.). The district court denied the TRO on August 13, 2025. (ECF 13). On August 20, 2025, the court set a briefing schedule for the preliminary injunction motion. (ECF 21). Defendants filed their response in opposition on September 3, 2025, with seven exhibits. (ECF 22, Defs.' Resp.; ECF 22-1 to 22-7). Plaintiffs filed their reply on September 8, 2025. (ECF 23, Pls.' Reply). After oral arguments on September 17, 2025 (ECF 26), the district court, Judge Sharon Johnson Coleman, denied the preliminary injunction on September 30, 2025, finding that plaintiffs failed to demonstrate a likelihood of success on the merits, irreparable harm, a favorable balance of equities, or that the public interest supported the injunction. (ECF 27, Mem. Op. at 1–16).

Plaintiffs filed a notice of appeal on September 30, 2025, seeking review of the denial of the preliminary injunction. (ECF 28, Pls' Not. App.; ECF 29, Dock. Stmt. at 2).

## SUMMARY OF ARGUMENT

The district court wrongly accepted defendants' use of the term "transgender" for a male student F.F. encountered in a girls' restroom on November 4, 2024, without requiring evidence like medical diagnoses, consistent gender expression, or legal recognition. This acceptance impaired the court's evaluation of plaintiffs' Equal Protection and Title IX claims. The district court also erred by upholding defendants' policy based on non-regulatory guidance from a state agency, which does not support unrestricted access, and in any case, cannot override federal law violations.

In addition, the district court incorrectly went along with defendants' argument that this Court's precedent grants schools unfettered discretion to allow facility access based on self-declared gender preferences. This misreading further distorted the court's Equal Protection and Title IX analyses. Finally, the district court misconstrued F.F.'s privacy concerns as solely about sexual interest, ignoring broader privacy interests in sex-separated facilities, and undercutting its holdings with respect to plaintiffs' Equal Protection and Title IX claims and vitiating its findings about irreparable harm and balancing equities.

In fact, plaintiffs are substantially likely to prevail on the merits of their Equal Protection and Title IX claims, will suffer irreparable harm absent preliminary

injunctive relief during the pendency of his action, and will be deprived of adequate remedies at law. The balance of harm favors the granting of such relief.

## STANDARD OF REVIEW

A preliminary injunction is an exceptional remedy. See *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of United States of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008) (stating that "a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.") (internal quotation marks and citation omitted). It is not granted as a matter of right. *D.U. v. Rhoades*, 825 F.3d 331, 335 (7th Cir. 2016).

This Court reviews the denial of a preliminary injunction for abuse of discretion, with legal questions reviewed *de novo*, *Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1057 (7th Cir. 2016), and factual findings assessed for clear error. *Fed. Trade Comm'n v. Advocate Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2016). Considerable deference is afforded the district court's "weighing of evidence and balancing of the various equitable factors." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015).

A two-step analysis is employed to determine whether preliminary injunctive relief is warranted. *Id.* at 661. First, the party requesting the preliminary injunction must make a threshold showing that: (1) absent preliminary injunctive relief, they will suffer irreparable harm during the pendency of the action; (2) other available legal remedies are inadequate; and (3) there is a reasonable likelihood of success on the

merits. *Id.* at 661–62; *see also Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020) (holding that party seeking injunction must make a "strong" showing, revealing how it proposes to prove its case). If the movant meets this threshold, the court must conduct a balancing analysis to assess whether the balance of harms favors the moving party or if the harm to other parties or the public significantly outweighs the movant's interests. *Jones*, 842 F.3d at 1058.

## ARGUMENT

The district court erred in denying plaintiffs' motion for a preliminary injunction against defendants' policy, which permits biological male students to access female-only restrooms, locker rooms, changing rooms, and showers at Bolingbrook High School based solely on self-declared gender preferences without objective criteria. This policy violates the Equal Protection Clause of the Fourteenth Amendment and Title IX of the Education Amendments of 1972 by arbitrarily compromising the privacy and safety of female students, including plaintiff F.F., who suffered intense anxiety and educational disruption after encountering a male student in a girls' restroom on November 4, 2024. (ECF 12, Ex. 1, F.F. Decl. ¶ 3; ECF 27, Mem. Op. at 2). The district court's acceptance of defendants' conclusory "transgender" label, reliance on non-binding state guidance, misinterpretation of precedent, and flawed findings on irreparable harm, remedies, and equities constitute reversible errors, necessitating an injunction to protect over 1,600 female students. (ECF 1, Compl. ¶ 29).

## I.    The District Court Erred in Accepting the Conclusory Label "Transgender" Without Requiring Objective Criteria, Voiding Its Evaluation of Plaintiffs' Likelihood of Success.

The district court erred by accepting defendants' self-referential deployment of the term "transgender" notwithstanding the lack of any specific, objective criteria for

verifying a student's transgender status. This blind acceptance fatally impairs the court's evaluation of plaintiffs' likelihood of success on their Equal Protection and Title IX claims.

A. At *Defendants' Urging, the District Court Stripped the Term "Transgender" of All Meaning.*

Defendants' policy allows biological male students to access female-only restrooms, locker rooms, changing rooms, and showers based solely on self-declared gender preferences, without requiring medical documentation, consistent gender expression, or legal recognition. (ECF 12, Ex. 2, J. Fisher Decl. ¶¶ 7, 12, 18). F.F.'s unrebutted declaration states that the male student she encountered in the girls' restroom on November 4, 2024, "wore typical male clothing" and showed "no outward appearance or indication of presenting as female." (ECF 12, Ex. 1, F.F. Decl. ¶ 3). Defendants did not contest this description or provide evidence—such as a declaration from the student, school staff, or records—demonstrating the student's transgender status through a medical diagnosis, consistent gender presentation, or legal recognition. (ECF 23, Pls.' Reply at 2). In reviewing the district court's ruling on a motion for preliminary injunction, this Court must, as the district should have done, accept as true F.F.'s unrebutted factual assertions. *See William v. San Francisco Unified Sch. Dist.*, 340 F. Supp. 438, 441 (N.D. Cal. 1972); *see also W. Air Lines, Inc. v. Flight Eng'rs Int'l Ass'n*, 194 F. Supp. 90, 93 (S.D. Cal. 1961).

Defendants' failure to rebut F.F.'s account undermines their claim that the policy applies only to "transgender students" accessing facilities "aligning with their gender identity." (ECF 22, Defs.' Resp. at 2–3). To merit the term "transgender," an individual must unambiguously and unvaryingly identify with the gender other than the biological sex determined at birth, often substantiated by medical diagnoses or social transition. *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 807 (11th Cir. 2022); *see also A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 773 (7th Cir. 2023) (emphasizing "enduring" gender identity with medical and legal support). Yet, defendants' policy requires no such evidence, allowing any male student to access female-only spaces by mere declaration. (ECF 12, Ex. 2, J. Fisher Decl. ¶¶ 7, 12).

This unbounded approach contrasts with cases where transgender students provided evidence of consistent gender identity, such as medical diagnoses or legal name changes. *See Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1040 (7th Cir. 2017), *abrogated on other grounds as recognized by*, *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020); *Martinsville*, 75 F.4th at 764–66, 773. Here, the student's male presentation, as described by F.F., suggests no such consistency. (ECF 12, Ex. 1, F.F. Decl. ¶ 3).

By accepting the conclusory label "transgender" without scrutiny, the district court erred in evaluating the policy's compliance with the Equal Protection Clause and Title IX. (ECF 27, Mem. Op. at 5–9). The Equal Protection Clause requires sex-based classifications to be "substantially related" to an "exceedingly persuasive" governmental interest. *United States v. Virginia*, 518 U.S. 515, 533 (1996). Defendants' policy, lacking objective standards, arbitrarily permits biological males to access female-only spaces, disproportionately burdening female students' privacy and safety. (ECF 1, Compl. ¶¶ 63–70). Similarly, Title IX prohibits sex-based discrimination that creates a hostile educational environment. 20 U.S.C. § 1681(a). The policy's failure to verify transgender status heightens F.F.'s "ongoing anxiety, humiliation, and disruption," forcing her to avoid restrooms or use staff facilities, which disrupts her education. (ECF 12, Ex. 1, F.F. Decl. ¶ 10). The district court's failure to address this arbitrariness was legal error, warranting reversal.

B. *The District Court Disregarded Evidence and Arguments Highlighting the Inaptness of the Term "Transgender" With Respect to Defendants' Policy.*

Indeed, in accepting defendants' characterization of the male student F.F. encountered as "transgender," the district court begged the question.

The district court's memorandum opinion and order (ECF 27) does not analyze whether the male student F.F. encountered in the girls' restroom was transgender. Nor does it explicitly—or even implicitly—make a factual determination to that effect.

Instead, the court simply accepts, *sub silentio*, defendants' assertion that the student was, in fact, transgender. In doing so, the court did not so much as allude to, let alone delve into or sift through, any specific evidence or criteria supporting the student's transgender status. To the contrary, the district court disregarded plaintiffs' arguments and F.F.'s unrebutted assertions refuting the propriety of characterizing this student as transgender. By smuggling the conclusion into the premise, the district court committed reversible error.

In narrating the incident of November 4, 2024, when F.F. encountered in the girls' restroom at Bolingbrook High School "an obvious male student standing in close proximity to and squarely in front of the stall door" (ECF 12, Ex. 1, F.F. Decl. ¶ 3), the district court affixes the label "transgender," without quotation marks, to this student, while adding, in quotation marks, the phrases "male-typical clothing" and "with no visible indication of female identity." (ECF 27, Mem. Op. at 2). Clearly, even as it quotes from F.F.'s unrebutted description of this student, the district court seeks to invalidate it by characterizing the student as transgender. And it doubles down on this characterization by repeating defendants' representation that this student's access to the restroom was pursuant to an "Individual Development Plan outlining gender-identity accommodations." (*Id.*). This confirms that the court accepted defendants' designation of the student as transgender without any scrutiny.

The district court's opinion does not discuss whether defendants provided evidence of the student's transgender status, such as a medical diagnosis, consistent gender presentation, or other objective criteria. Nor could it. Defendants supplied none. Seemingly agreeing with defendants' claim that "there is no legal floor that the school needs . . . to require for a student to prove their gender identity" (ECF 34, Tr. at 25:8–9), the district court declined to evaluate whether this student met any defined threshold for being considered transgender.

Ignoring the factual question of the student's gender identity and presuming him to be transgender in the face of contrary evidence, the district court hastened to consider the legality of the school district's policy under the Equal Protection Clause and Title IX. Worse, it addressed the policy's compliance with non-regulatory guidance from the Illinois Department of Human Rights and the availability of single-use restrooms as an accommodation for F.F. (ECF 27, Mem. Op. at 6–7, 13–15). Far from requiring defendants to justify the student's transgender designation, the district court did not pause to even address or question this designation.

The district court ignored plaintiffs' persistent and pointed challenges to this male student's claims to transgender status. In their motion, right at the outset, plaintiffs unmistakably declared, "This is not a case involving 'transgender' students— students suffering from gender dysphoria who have or seek to 'transition' to the sex

opposite that of their biological sex." (ECF 12, Pls.' Mot. at 3) (comparing the facts of this case unfavorably with those in *Martinsville*, 75 F.4th at 764, 765, which granted access to the boys' restrooms to teenage biological girls, who had "socially transitioned" to be boys). Instead of engaging with that declaration, the district court simply ignored it.

Further, in their reply, plaintiffs contrasted both medical and legal definitions of the term "transgender," on the one hand, with the profile of the student F.F. encountered, on the other. Quoting 1 B. Sadock, V. Sadock, & P. Ruiz, Comprehensive Textbook of Psychiatry 2063 (9th ed. 2009), plaintiffs wrote, "'Transgender' refers to 'any individual who identifies with and adopts the gender role of a member of the other biological sex.'" (ECF 23, Pls.' Reply at 3). Plaintiffs argued that abiding by that definition, "an individual would be deemed transgender . . . only upon regularly and uniformly presenting as a member of the opposite biological sex." (*Id.*)

Likewise, quoting *Adams*, 57 F.4th at 807, plaintiffs pointed out that "courts refer to a 'transgender student' as one who 'consistently, persistently, and insistently identifies as a gender that is different than the sex assigned at birth.'" (ECF 23, Pls.' Reply at 3) (alteration and emphasis omitted).

By comparison with those definitions requiring constancy in gender expression, as plaintiffs observed, "F.F.'s unrebutted assertions establish that the male student she encountered exhibited no outward signs of identifying as female, such as female-typical clothing or gender expression." (*Id.*) (citing ECF 12, Ex. 1, F.F. Decl. ¶ 3). Moreover, according to the school principal at least, this male student "was granted access only to the girls' restrooms and not to the girls' locker rooms, changing rooms, or showers." (ECF 23, Pls.' Reply, Ex. 2, Fisher 2d Dec. ¶ 8). That this male student continued to use the boys' locker rooms, changing rooms, and showers but sought access to the girls' restrooms only, by itself, renders untenable any possible avowals of "consistently, persistently, and insistently" identifying as a female.

During oral argument on plaintiffs' motion, their counsel went to great lengths to highlight defendants' "circular reasoning," which he pointed out, proceeded as follows: a male student who "expressed a preference to use female-only spaces" is *ipso facto* branded transgender, and that branding alone then suffices to grant this male "access to female-only spaces." (ECF 34, Tr. at 3:21, 6:21–25, 22:5–9). Counsel argued, "Transgender has to mean something. And at a minimum it has to mean consistent gender identity." (ECF 34, Tr. at 22:9–10). On no less than four occasions, counsel described defendants' use of the term "transgender" in referring to the male

student F.F. encountered as a "conclusory label," invoked by defendants to shut down debate. (ECF 34, Tr. at 3:20–21, 21:24–25, 22:11–15, 27:7–8).

Let alone disprove them, the district court did not even acknowledge those arguments, simply accepting defendant's conclusory label, evidently to forestall any analysis on its part.

## II. The District Court Erred in Relying on Non-Binding Illinois Guidance to Justify Defendants' Policy, Which Lacks Objective Criteria and Violates Federal Law.

The district court abused its discretion by accepting defendants' reliance on non-regulatory guidance from the Illinois Department of Human Rights (IDHR) to justify a policy allowing biological males to access female-only restrooms, locker rooms, changing rooms, and showers based solely on self-declared gender preferences. (ECF 27, Mem. Op. at 2–3, 6–7, 13–15). The IDHR guidance does not endorse defendants' unbounded policy, as it implies objective criteria for verifying gender identity. Moreover, as non-binding guidance, it cannot override violations of the Equal Protection Clause and Title IX.

### A. *The IDHR Guidance Does Not Support Defendants' Policy Lacking Objective Criteria.*

Defendants claim their policy, which permits biological males to access female-only spaces without objective verification, aligns with IDHR guidance allowing students to use facilities "that correspond to the student's gender identity." (ECF 22,

Defs.' Resp. at 6, 18–20; ECF 22-1). The district court credited this argument, noting the policy's compliance with the guidance. (ECF 27, Mem. Op. at 2–3, 6–7). This was error. The IDHR guidance's reference to "gender identity" suggests a consistent, verifiable identity, not an unverified, subjective declaration. *Compare Adams*, 57 F.4th at 807 (defining transgender students as those who "consistently, persistently, and insistently" identify as a different gender); *Martinsville*, 75 F.4th at 773 (emphasizing "enduring" gender identity with medical or legal support).

Defendants' policy, however, requires no objective evidence—such as medical diagnosis, consistent gender expression, or legal recognition—to confirm transgender status. (ECF 12, Ex. 2, J. Fisher Decl. ¶¶ 7, 12, 18). F.F.'s unrebutted declaration illustrates this flaw: the male student she encountered in the girls' restroom on November 4, 2024, "wore typical male clothing" and showed "no outward appearance or indication of presenting as female." (ECF 12, Ex. 1, F.F. Decl. ¶ 3). Defendants offered no evidence, such as a declaration or school records, to establish the student's transgender status or compliance with any objective criteria. (ECF 23, Pls.' Reply at 2; ECF 22-2, ¶¶ 2, 14).

The district court's failure to scrutinize defendants' self-referential dependence on the IDHR guidance constitutes legal error. The guidance does not authorize unrestricted access based on fleeting declarations; rather, it implies a need for

substantiated gender identity, consistent with judicial standards requiring consistency or documentation. *See Whitaker*, 858 F.3d at 1040 (transgender student furnished medical and legal evidence); *Martinsville*, 75 F.4th at 764–66. By accepting defendants' broad interpretation without requiring objective criteria, the district court misapplied the guidance and overlooked the policy's discriminatory impact on female students.

B.    *Non-Binding IDHR Guidance Cannot Override Federal Constitutional and Statutory Violations.*

Even if the IDHR guidance supported defendants' policy, it lacks the force of law and cannot excuse violations of federal protections. The district court erred in deferring to the guidance as justification for denying the preliminary injunction. (ECF 27, Mem. Op. at 2–3, 6–7, 13–15). Non-regulatory guidance, such as the IDHR's or the Policy Reference Education Subscription Service (PRESS) cited by defendants (ECF 22, Defs.' Resp. at 19; ECF 22-7, at 6), does not have legal authority. *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (observing that "interpretations contained in policy statements, agency manuals, and enforcement guidelines, all . . . lack the force of law"); *compare Illinois Dep't of Revenue v. Illinois Civ. Serv. Comm'n*, 357 Ill. App. 3d 352, 363, 827 N.E.2d 960, 970 (2005) (circumscribing agency-made law to "[p]roperly promulgated administrative regulations"). Finally, even if the IHDR guidance somehow did have the force of law, it cannot supersede the Equal Protection Clause or Title IX. "[A] state law that impinges upon a substantive right or liberty

created or conferred by the Constitution is, of course, presumptively invalid." *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 61 (1973) (Stewart, J., concurring). Likewise, "Title IX would preempt state law." *Soule v. Connecticut Ass'n of Sch.*, 755 F. Supp. 3d 172, 195 n. 18 (D. Conn. 2024).

The lack of objective criteria in defendants' policy violates the Equal Protection Clause by arbitrarily subjecting female students, including F.F., to share private spaces with biological males. (ECF 1, Compl. ¶¶ 63–70). This Court has held that policies affecting sex-segregated facilities must withstand heightened scrutiny. *Whitaker*, 858 F.3d at 1049–50. The policy also violates Title IX by creating a hostile educational environment, as F.F.'s "ongoing anxiety, humiliation, and disruption" from encountering a male student in the restroom forces her to avoid facilities or lose instructional time. (ECF 12, Ex. 1, F.F. Decl. ¶ 10). The district court's reliance on non-binding guidance to dismiss these violations erroneously ignored the precedence accorded federal law.

C.    *The Policy's Overreach Harms Female Students and Supports Injunctive Relief*

The policy's failure to require objective criteria enables arbitrary access, as evidenced by the male student's male presentation in the girls' restroom. (ECF 12, Ex. 1, F.F. Decl. ¶ 3). This incident, affecting F.F. and potentially over 1,600 female students at Bolingbrook High School (ECF 1, Compl. ¶ 29), underscores the policy's

harm. The district court's acceptance of the IDHR guidance without addressing this overreach ignored the policy's impact on female students' privacy and safety. (ECF 27, Mem. Op. at 6–7). An injunction requiring objective criteria would balance transgender accommodations with female students' rights, serving the public interest. *Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004).

## III. The District Court Erred in Accepting Defendants' Misapprehension of this Court's Precedent That Schools Have Unfettered Discretion to Define Transgender Status Without Objective Criteria.

The district court abused its discretion by accepting defendants' argument that *Martinsville*, 75 F.4th 760, grants schools unfettered discretion to allow access to sex-segregated facilities based solely on a student's self-declared gender identity without objective criteria. (ECF 34, Tr. at 25:7–14). This argument misapprehends *Martinsville* and related Seventh Circuit precedent, leading the district court to err in denying plaintiffs' preliminary injunction. The court's acceptance of defendants' misinterpretation vitiated its evaluation of plaintiffs' likelihood of success on their Equal Protection and Title IX claims.

### A. *Martinsville Does Not Grant Schools Unlimited Discretion to Forgo Objective Criteria.*

Defendants argued that *Martinsville* establishes "no legal floor" for schools to require proof of a student's gender identity, leaving such decisions entirely to school discretion. (ECF 34, Tr. at 25:7–9). The district court evidently credited this

interpretation, as it upheld defendants' policy allowing biological males to access female-only restrooms, locker rooms, changing rooms, and showers based solely on self-declared gender preferences, without objective verification. (ECF 27, Mem. Op. at 2–3, 6–7). Because *Martinsville* does not endorse such unchecked discretion, this constituted error.

In *Martinsville*, this Court upheld a preliminary injunction allowing transgender students to use restrooms designated for the opposite biological sex, emphasizing "ample evidence" of "enduring" gender identity, including medical diagnoses, professional care for transition, legal name changes, and gender-marker changes. 75 F.4th at 773. The Court distinguished this from cases "where only subjective 'self-identification' is offered as the basis for the plaintiffs' requests." *Id.*

Far from granting schools *carte blanche*, *Martinsville* underscores the importance of objective evidence—such as medical or legal documentation—to substantiate gender identity claims in the context of access to sex-segregated facilities. Similarly, in *Whitaker*, this Court affirmed a preliminary injunction for a transgender student who provided evidence of a medical diagnosis and social transition. 858 F.3d at 1040. In that case, the Court unequivocally declared, "This is not a case where a student has merely announced that he is a different gender." *Id.* at 1050.

These cases establish that policies governing sex-segregated facilities must be grounded in verifiable criteria to withstand scrutiny under federal law.

Defendants' policy, however, requires no such evidence. It permits access to female-only spaces based solely on a student's self-declaration, without medical documentation, consistent gender expression, or legal recognition. (ECF 12, Ex. 2, J. Fisher Decl. ¶¶ 7, 12, 18). F.F.'s unrebutted declaration illustrates the policy's arbitrariness: the male student she encountered in the girls' restroom on November 4, 2024, "wore typical male clothing" and showed "no outward appearance or indication of presenting as female." (ECF 12, Ex. 1, F.F. Decl. ¶ 3). Defendants offered no evidence to confirm the student's transgender status, such as a declaration or school records. (ECF 23, Pls.' Reply at 2; ECF 22-2, ¶¶ 2, 14).

The district court's acceptance of defendants' misreading of *Martinsville* as allowing unverified access was legal error. *Martinsville*'s emphases on objective evidence and on requiring schools to ensure that their policies are not arbitrary directly contradicts defendants' claim of unlimited discretion, invoked as a shield against all allegations of violating federal protections.

B.    *The Lack of Objective Criteria Violates the Equal Protection Clause.*

The district court's error in crediting defendants' misinterpretation of *Martinsville* voids its evaluation of plaintiffs' Equal Protection claim. Sex-based

classifications, like defendants' policy allowing biological males into female-only spaces, must be "substantially related" to an "exceedingly persuasive" governmental interest. *Virginia*, 518 U.S. at 533. By relying on self-declaration without objective criteria, the policy arbitrarily burdens female students, forcing them to share private spaces with biological males who may not consistently identify as female. (ECF 1, Compl. ¶¶ 63–70). The male student's male presentation in the restroom incident (ECF 12, Ex. 1, F.F. Decl. ¶ 3) exemplifies this arbitrariness, which *Martinsville* does not sanction. The district court's failure to require objective criteria, contrary to *Martinsville*'s guidance, rendered its Equal Protection analysis flawed. *See Whitaker*, 858 F.3d at 1049–50 (heightened scrutiny applies to restroom policies).

C.    *The Lack of Objective Criteria Violates Title IX.*

Similarly, the district court's reliance on defendants' misreading of *Martinsville* voids its evaluation of plaintiffs' Title IX claim. Title IX prohibits sex-based discrimination that creates a hostile educational environment. 20 U.S.C. § 1681(a). The policy's lack of objective criteria, permitting unverified access to female-only spaces, subjects F.F. and over 1,600 female students to ongoing "anxiety, humiliation, and disruption," forcing them to avoid restrooms or use staff facilities, which disrupts education. (ECF 12, Ex. 1, F.F. Decl. ¶ 10; ECF 1, Compl. ¶ 29). This Court has recognized such harms as actionable under Title IX. *Martinsville*, 75 F.4th at 769–72;

*Whitaker*, 858 F.3d at 1046–50; *cf. Doe v. Purdue Univ.*, 928 F.3d 652, 669–70 (7th Cir. 2019) (plausibility of sex being one factor in motivating a school's decision sufficient for a student's Title IX claim to survive motion to dismiss).

*Martinsville*'s focus on verified gender identity, 75 F.4th at 773, underscores that arbitrary policies, like defendants', violate Title IX by failing to balance student rights. The district court's acceptance of defendants' argument was legal error.

D.     *The Error Supports Reversal of the Preliminary Injunction Denial.*

The district court's misapprehension of *Martinsville* led to an erroneous finding that plaintiffs were unlikely to succeed on their claims. (ECF 27, Mem. Op. at 5–11). By accepting defendants' claim of unfettered discretion, the court overlooked the policy's discriminatory impact and harm to female students. An injunction requiring objective criteria or single-use facilities for students with non-conforming gender preferences would remedy this harm while accommodating transgender students, serving the public interest. *Joelner*, 378 F.3d at 620. This Court should reverse and remand with instructions to grant the preliminary injunction.

**IV.     The District Court Erred in Mischaracterizing F.F.'s Privacy Concerns as Solely Related to Sexual Interest, Ignoring Established Privacy Interests in Sex-Separated Facilities.**

The district court abused its discretion in denying plaintiffs' preliminary injunction by mischaracterizing F.F.'s privacy concerns as solely a fear of sexual interest, evidenced by its statements during oral argument, thereby undervaluing the

well-established privacy interests in sex-separated facilities. This error not only improperly undercut plaintiffs' Equal Protection and Title IX claims, it also led to incorrect findings on irreparable harm and the balance of equities.

A. *The District Court Mischaracterized F.F.'s Privacy Concerns as Sexual in Nature.*

During oral argument, the district court misconstrued F.F.'s anxiety about encountering a biological male in the girls' restroom as exclusively an apprehension about being the object of sexual voyeurism. The court asked whether F.F. wished that "only girls . . . see her pull her pants down." (ECF 34, Tr. at 8:25–9:1). Probing F.F.'s worry about "boys being able to see through the gaps," the district court posited a hypothetical scenario involving an inquisitive girl in the restroom, and asked rhetorically, "what if that female is into girls and wants to peek at her in a way that she's saying that a boy might peek at her?" (*Id.* at 9:6–7, 13–15).

The district court doubled down:

> She's afraid to take her pants down because somebody's looking at her, and she's saying it's because a boy is looking at her. I'm just trying to figure out is there a presumption that there's only going to be a boy who would look at her like that, as opposed to there being a girl who might look at her like that? That sounds like that's the presumption to me. (*Id.* at 9:19–25).

The court returned to this troubling line of inquiry toward the end of oral argument, accusing counsel of "making an assumption that just because a male is in there . . . your client is now in harm's way in a girls' bathroom that she might not be

in if there was just another girl there who may like girls." (*Id.* at 27:24–28:4). These remarks reflect the district court's erroneous view that F.F.'s objection was confined to fears of being seen as a sex object.

F.F.'s counsel clarified that her concern was broader: "She does not want to be confronted in a girls-only restroom by a male who is a biological male and a social male." (*Id.* at 9:8–10). F.F.'s unrebutted declaration confirms this, describing "ongoing anxiety, humiliation, and disruption" from encountering a male student who "wore typical male clothing" and showed "no outward appearance or indication of presenting as female" in a restroom with "wide gaps" in the stall doors, heightening her fear of exposure. (ECF 12, Ex. 1, F.F. Decl. ¶¶ 3, 10; ECF 1, Compl. ¶ 2). The district court's focus on sexual interest ignored F.F.'s broader privacy concerns about sharing intimate spaces with a biological male, regardless of intent, under defendants' policy allowing unverified access based on self-declared gender preferences. (ECF 12, Ex. 2, J. Fisher Decl. ¶¶ 7, 12, 18; ECF 27, Mem. Op. at 5–11).

B.    *Sex-Separated Facilities Protect Broad Privacy Interests, Not Just Sexual Privacy.*

The district court's mischaracterization conflicts with longstanding legal recognition of privacy interests in sex-separated facilities, which extend beyond preventing sexual interest to safeguarding bodily privacy from the opposite sex. The Eleventh Circuit in *Adams*, 57 F.4th at 805, noted that "sex-separation in bathrooms

30

dates back to ancient times" and is "widely recognized throughout American history and jurisprudence" to protect privacy due to physical differences between sexes. The Supreme Court has affirmed this, stating that integrating sexes in institutional settings "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements." *Virginia*, 518 U.S. at 550 n.19.

This Court has similarly recognized that "the law tolerates same-sex restrooms . . . to accommodate privacy needs." *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 913 (7th Cir. 2010); *see also Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994) (acknowledging privacy interest in shielding body from opposite sex).

Courts of appeals have consistently held that involuntary exposure to the opposite sex in intimate settings is "especially demeaning and humiliating." *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993) (quoting *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981)); *see also Harris v. Miller*, 818 F.3d 49, 59 (2d Cir. 2016); *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494–95 (6th Cir. 2008). These precedents establish that sex-separated facilities protect a fundamental right to bodily privacy, not merely protection from sexual advances. The district court's erroneous focus on sexual interest minimized the harm to F.F. and over 1,600 female students at Bolingbrook High School, who face privacy invasions under defendants' policy. (ECF 1, Compl. ¶ 29; ECF 27, Mem. Op. at 11–13).

C.    *The Mischaracterization Undermined the Preliminary Injunction Analysis.*

The district court's mischaracterization of F.F.'s concerns as solely sexual led to flawed findings on irreparable harm and the balance of equities. F.F.'s ongoing "anxiety, humiliation, and disruption" from sharing restrooms with biological males, exacerbated by stall gaps, constitutes irreparable harm, as it forces her to avoid facilities or use staff restrooms, disrupting her education. (ECF 12, Ex. 1, F.F. Decl. ¶ 10). This Court has recognized such psychological and educational harms as irreparable. *Whitaker*, 858 F.3d at 1045. The district court's suggestion that F.F.'s harm was speculative absent evidence of the male student attempting to view her (ECF 27, Mem. Op. at 2) ignored the inherent privacy violation caused by the presence of a member of the opposite sex in intimate spaces.

This error also skewed the balance of equities. Protecting female students' privacy outweighs defendants' minimal burden of implementing single-use gender-neutral facilities for those with non-conforming gender preferences. (ECF 12, Pls.' Mot. at 2; ECF 27, Mem. Op. at 2). The public interest favors injunctive relief to remedy constitutional and statutory violations. *Joelner*, 378 F.3d at 620. The district court's mischaracterization warrants reversal.

## V. Plaintiffs Are Substantially Likely to Prevail on the Merits.

To reiterate, this case does not involve "transgender" students—those with gender dysphoria who have transitioned or are transitioning to the opposite sex from their biological sex. *Compare Martinsville*, 75 F.4th at 764, 765 (permitting teenage biological girls who "socially transitioned" to boys to use boys' restrooms). Nor does it concern students who have "provided ample evidence of their medical diagnoses and the care they receive from professionals to assist in their transitions." *Id.* None of the students have shown that their gender identities are "enduring," such as through "legal name changes and gender-marker changes." *Id.* There is no evidence of ongoing medical treatment. Rather, this case involves "requests for gender-affirming facility access [that] could be questioned," as they rely solely on "subjective 'self-identification'" as the basis for accessing opposite-sex facilities. *Id.*

As such, this Court's precedent permitting transgender students to access opposite-sex school facilities is inapplicable. *See Martinsville*, *supra*; *see also Whitaker*, 858 F.3d at 1040 (allowing a biological female high school student who "publicly transition[ed]" to male to use boys' restrooms). This Court has itself cast doubt on the ongoing validity of that precedent following the Supreme Court's decision in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), which held that state laws barring sex-transitioning medical treatments for minors do not warrant heightened scrutiny under

the Equal Protection Clause. *See D.P. by A.B. v. Mukwonago Area Sch. Dist.*, No. 23-2568, 2025 WL 1794428, at *1 (7th Cir. June 30, 2025) (granting a "panel rehearing to consider whether the court should overrule *Whitaker . . .* and *Martinsville . . .* in light of *Skrmetti*"), *vacating* 140 F.4th 826 (7th Cir. 2025).

Regardless of this Court's ultimate resolution of this issue, the question in this case is straightforward: Biological males should not gain access to school facilities designated for females based solely on a declared preference for such access.

A.    *Defendants' Policy Violates the Equal Protection Clause.*

The Equal Protection Clause requires equal treatment for individuals in similar situations. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). It prohibits deliberate and arbitrary discrimination. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). Generally, state actions are presumed valid and upheld if the classification is rationally related to a legitimate state interest. *City of Cleburne*, 473 U.S. at 440. This rational-basis review, however, does not apply to classifications based on sex. *Whitaker*, 858 F.3d at 1050. For sex-based classifications, the state must provide an "exceedingly persuasive" justification. *Virginia*, 518 U.S. at 533. The state bears the burden of showing that the classification serves important governmental objectives and that the discriminatory measures are substantially related to achieving those objectives. *Id.*

Justifications cannot rely on *post hoc* rationales created during litigation or on broad generalizations about sex; they must be genuine. *Whitaker*, 858 F.3d at 1050.

Defendants' policy here permits male students with non-conforming gender preferences to use multi-use, sex-segregated spaces previously designated for females. This constitutes discrimination against female students by denying them access to secure, sex-segregated spaces free from male intrusion.

This discrimination is inherently sex-based. The spaces chosen to accommodate biological male students with non-conforming gender preferences are those originally reserved for female students. The sole criterion for selecting these spaces is their prior designation for the opposite sex. In other words, the sex of the space's original users determines whether it is repurposed to accommodate male students with non-conforming gender preferences. This policy disproportionately impacts female students, who face privacy violations or must seek inconvenient alternatives, such as staff restrooms, disrupting their education. (ECF 12, Ex. 1, F.F. Decl. ¶ 10; ECF 1, Compl. ¶¶ 10, 15).

In *Whitaker*, 858 F.3d at 1051–54, this Court held that discrimination based on the social construct of sex, such as gender identity, triggers heightened scrutiny under the Equal Protection Clause. The policy in that case, which mandated restroom use based on birth-certificate sex, was found to discriminate against transgender

students by reinforcing sex-based stereotypes, failing to provide an "exceedingly persuasive" justification. *Id.* at 1051–52 (citing *Virginia*, 518 U.S. at 533).

Here, defendants' policy, which allows biological males access to female-only spaces based solely on self-declared preferences without evidence of female gender identity, represents a clearer violation of the Equal Protection Clause. Lacking any grounding in a recognized social construct of sex or biological sex, this policy disproportionately harms biological girls like F.F.

The *Whitaker* court applied heightened scrutiny to a sex-based classification that denied transgender students restroom access aligned with their gender identity, finding it relied on stereotypes without a valid justification. *Id.* at 1051. By contrast, defendants' policy here creates a sex-based classification by allowing biological males to use female-only restrooms, locker rooms, changing rooms, and showers based only on self-declared preferences, directly violating female students' privacy. F.F.'s distressing experience with a male student in a girls' restroom, where she feared exposure due to the stall's design, highlights this harm. Unlike *Whitaker*, where the policy addressed gender identity, defendants' policy here relies solely on preference, lacking any connection to gender identity and emphasizing its discriminatory impact.

Defendants' policy fails heightened scrutiny, as it provides no important governmental objective for prioritizing male preferences over female students' privacy

and safety. By compelling girls like F.F. to share female-only spaces or pursue burdensome alternatives, such as staff restrooms—which were ultimately denied to F.F.—the policy imposes a disproportionate burden. (ECF 12, Ex. 1, F.F. Decl. ¶ 9; ECF 12, Ex. 2, J. Fisher Decl. ¶ 11; ECF 1, Compl. ¶ 47). This differential treatment rests on an arbitrary criterion—preference—constituting a clear violation of the Equal Protection Clause.

*Whitaker*, 858 F.3d at 1053–54, criticized the arbitrariness of relying on birth certificates, noting their inconsistency due to chromosomal variations or differing state policies. Defendants' policy is even more arbitrary, as it requires no objective criteria, such as medical documentation or gender expression, for male access to female spaces. This forces female students to endure anxiety, avoid restrooms, or disrupt their education, as F.F. experienced.

*Whitaker*'s reasoning applies here with greater force, as defendants' reliance on preference, rather than gender identity, creates a more overt sex-based classification. While *Whitaker* protected transgender students from exclusion based on stereotypes, the policy here marginalizes biological girls by denying them secure, sex-segregated spaces, forcing them to accommodate male preferences. This direct and unjustified infringement on female students' privacy and safety demands stronger Equal

Protection Clause protection for biological girls like F.F. than for the transgender students in *Whitaker*.

Defendants seek to justify their policy by presenting it as "inclusive," allowing all students to use restrooms consistent with their "gender identity." (ECF 22, Defs.' Resp. at 2–3, 5–8). Their opposition, however, fails to contest the pivotal fact that the policy permits biological males to enter female-only spaces—such as restrooms, locker rooms, changing rooms, and showers—based solely on a self-declared preference, without requiring evidence of transgender status, medical documentation, or consistent gender expression. This policy is not confined to accommodating transgender students; rather, it allows any biological male to access female-only spaces with a mere declaration, as demonstrated by the incident involving F.F. on November 4, 2024. (ECF 12, Ex. 1, F.F. Decl. ¶¶ 3–4). Defendants' inability to provide a written policy or refute this account confirms that this is their operative practice. (ECF 12, Ex. 2, J. Fisher Decl. ¶¶ 5, 7).

This policy inherently discriminates based on sex. By designating female-only spaces for access by biological males based solely on their stated preference, the policy deprives female students, including F.F., of the privacy and safety afforded by sex-segregated facilities. Defendants argue that their policy is "neutral" because it applies uniformly to all students. (ECF 22, Defs.' Resp. at 7). Yet, this argument overlooks

the disproportionate impact on female students, who face distinct privacy and safety concerns when biological males are allowed to enter spaces traditionally reserved for their exclusive use. The selection of female-only spaces for access by the opposite sex is inherently a sex-based classification, as it depends on the sex of the space's original designees. This directly burdens female students, compelling them to share intimate facilities with biological males or pursue inconvenient alternatives, such as staff restrooms, which disrupt their education. (ECF 12, Ex. 1, F.F. Decl. ¶ 10; ECF 1, Compl. ¶¶ 10, 15).

Defendants' reliance on *Whitaker* and *Martinsville* is misguided. Those cases involved transgender students who had socially transitioned, provided medical documentation, and consistently expressed their gender identity, seeking access to facilities aligned with that identity. In contrast, the male student F.F. encountered displayed no indications of female gender identity, and defendants' policy requires no such evidence. (ECF 12, Ex. 1, F.F. Decl. ¶ 3; ECF 12, Ex. 2, J. Fisher Decl. ¶¶ 7, 12, 18). Unlike *Whitaker* and *Martinsville*, where policies excluding transgender students were found to violate the Equal Protection Clause, the policy here discriminates against female students by prioritizing male preferences over their fundamental rights to privacy and safety. Defendants' policy warrants an inverse application of *Whitaker* and *Martinsville*: Because it imposes a disproportionate burden on female students

without any justification tied to transgender accommodation, it is discriminatory and must be invalidated.

Furthermore, if defendants' policy similarly permits biological females to access male-only spaces based on self-declared preferences, this would also constitute sex-based discrimination—against male students. A policy can discriminate against both sexes simultaneously by undermining the privacy and safety of sex-segregated spaces for all students. The record here, however, emphasizes the harm to female students, as evidenced by F.F.'s experience and the concerns of other female students. (ECF 12, Ex. 1, F.F. Decl. ¶¶ 10, 12). Defendants' assertion that the policy is "inclusive" (ECF 22, Defs.' Resp. at 8, 11) and "neutral" (ECF 22, Defs.' Resp. at 7) does not mitigate its discriminatory impact.

B.     *Defendants' Policy Violates Title IX.*

Title IX prohibits discrimination based on sex in federally funded educational programs, including policies that foster a hostile educational environment. 20 U.S.C. § 1681(a); *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999). The School District, which received over $30 million in federal funding in 2023 (ECF 1, Compl. ¶ 19), intentionally discriminates against female students by exposing them to the ongoing risk of encountering biological males in female-only spaces, resulting in anxiety, humiliation, and educational disruption. (ECF 12, Ex. 1, F.F. Decl. ¶¶ 10–

11; ECF 1, Compl. ¶¶ 13, 74-75). F.F.'s avoidance of restrooms and reliance on distant facilities, which caused her to miss instructional and school activity time, illustrates this harm. (ECF 12, Ex. 1, F.F. Decl. ¶ 10).

This Court has ruled that policies denying students access to facilities aligned with their gender identity may constitute sex-based discrimination under Title IX, particularly when such policies rely on sex-stereotyping or fail to consider a student's transgender status. *Whitaker*, 858 F.3d at 1048–50; *Martinsville*, 75 F.4th at 769–70. Although *Whitaker* and *Martinsville* addressed transgender students seeking access to facilities matching their gender identity, the principle from those cases applies inversely here: Defendants' policy discriminates by compelling female students to share facilities with biological males based solely on self-declared preferences, without requiring objective criteria such as medical documentation or gender identity. (ECF 12, Ex. 2, J. Fisher Decl. ¶¶ 7, 12, 18).

In *Whitaker*, 858 F.3d at 1050, and *Martinsville*, 75 F.4th at 773, the transgender students were socially recognized as boys and provided evidence of medical diagnoses and consistent gender expression. In stark contrast, the male student F.F. encountered in the girls' restroom showed no outward signs of identifying as female. (ECF 12, Ex. 1, F.F. Decl. ¶ 3). Under defendants' policy, males granted access to female-only

facilities are not required to express any female identity, underscoring the policy's discriminatory impact.

In *Martinsville*, 75 F.4th 760, 775 (7th Cir. 2023), the majority held that Title IX's reference to "sex" likely encompasses the social construct of gender identity rather than biological sex, rejecting the contrary ruling in *Adams v. St. Johns County School Board*, 57 F.4th 791 (11th Cir. 2022). The concurrence in *Martinsville* argued that *Adams* provided the better reasoning. *Martinsville*, 75 F.4th at 775 (Easterbrook, J., concurring). Nevertheless, defendants' policy here falls well below the *Martinsville* standard by permitting biological males access to female-only spaces based solely on self-declared preference, without any social recognition as female. Consequently, plaintiffs are substantially likely to succeed on their Title IX claim.

## VI. The District Court Erred in Determining No Irreparable Harm.

The party moving for a preliminary injunction must show a likelihood of suffering irreparable harm if preliminary injunctive relief is not granted. *See Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 787 (7th Cir. 2011). A mere possibility of harm is insufficient. *Id.* at 788. The harm, however, need not have already occurred to justify injunctive relief. *Id.*

Nor must the harm be certain to occur before a court may grant relief on the merits. *Id.* Rather, harm is deemed irreparable if it "cannot be prevented or fully

remedied by the final judgment after trial." *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1089 (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)) (internal quotation marks omitted). Because a district court's finding on irreparable harm is a factual determination, it is reviewed for clear error. *Id.* at 1087.

The district court incorrectly determined that F.F.'s alleged harm—stemming from her encounter with a male student in the girls' restroom and the ongoing fear of compromised privacy—did not rise to the level of irreparable harm recognized in *Whitaker*, 858 F.3d 1034, and *Martinsville*, 75 F.4th 760. (ECF 27, Mem. Op. at 11–13). The district court held that F.F.'s distress was "entirely conjectural" and distinguishable from the harms in *Whitaker* and *Martinsville* because it lacked evidence of stigmatization, suicidal ideation, or diminished well-being akin to those cases. (*Id.*) This conclusion misinterprets the standard for irreparable harm and improperly narrows the scope of harm recognized by this Court.

Irreparable harm requires a showing that the harm "cannot be prevented or fully rectified by the final judgment after trial," not that it must mirror the specific harms of gender dysphoria or suicidal ideation. *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1089. F.F. alleged "intense feelings of anxiety, discomfort, and shame," triggered by the possibility of exposure in a restroom with inadequate privacy protections, leading to behavioral changes such as avoiding restrooms during her

menstrual cycle and missing classroom instruction time to use distant facilities. (ECF 27, Mem. Op. at 2–4).

These harms—ongoing psychological distress and educational disruption—are precisely the types of injuries this Court has recognized as irreparable. In *Whitaker*, the court found irreparable harm where a transgender student experienced anxiety, depression, and educational disruption due to exclusionary restroom policies. 858 F.3d at 1045–46. Similarly, in *Martinsville*, the court recognized that exclusion from gender-affirming facilities exacerbated distress and interfered with education, constituting irreparable harm. 75 F.4th at 764, 767.

The district court's insistence that F.F.'s harm is not irreparable because it lacks the "stigmatization stemming from gender dysphoria" or "suicidal ideation" imposes an unduly restrictive standard not supported by precedent. (ECF 27, Mem. Op. at 12). This Court has never required plaintiffs to demonstrate suicidal ideation or gender dysphoria to establish irreparable harm. Rather, the focus is on whether the harm is ongoing and cannot be adequately remedied following the conclusion of the trial. *See U.S. Army Corps of Engineers*, 667 F.3d at 788 (requiring more than a "mere possibility of harm").

F.F.'s documented anxiety, shame, and educational disruptions—stemming from defendant's policy allowing unrestricted access to female restrooms based on self-

declared gender preference—satisfy this threshold. The district court's dismissal of these harms as "speculative" ignores F.F.'s concrete behavioral changes, such as skipping restroom visits and losing instructional time, which are neither hypothetical nor remediable by monetary damages. (ECF 27, Mem. Op. at 4).

The district court's conclusion that F.F.'s harm was speculative because she did not allege the male student "actually saw or tried to see her exposed body" (ECF 27, Mem. Op. at 2) ignores the policy's broader impact. The mere presence of biological males in female-only spaces, enabled by an arbitrary self-declaration policy, creates a reasonable fear of privacy invasion, exacerbated by the gaps in the restroom stalls. (ECF 1, Compl. ¶ 2; ECF 12, Ex. 1, F.F. Decl. ¶ 3).

With the school year ongoing (ECF 12, Ex. 2, J. Fisher Decl. ¶ 3), F.F. and other female students face continuous harm absent injunctive relief. Moreover, F.F. is a senior, and a trial is unlikely to conclude before she graduates. Any "final relief in a trial on the merits" will come too late for her. *U.S. Army Corps of Eng'rs*, 667 F.3d at 780.

## VII. The District Court Erred in Finding an Adequate Remedy at Law.

The moving party must also establish that no adequate legal remedy exists if the preliminary injunction is not granted. *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002). It is not necessary to show that the remedy would be entirely

ineffective. *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003). Instead, the party must demonstrate that any potential award would be "seriously deficient relative to the harm suffered." *Id.*

The district court erred in finding that defendants' remedial measures—installing rubber strips on stall doors and offering access to single-use staff restrooms—negated the need for injunctive relief. (ECF 27, Mem. Op. at 13). These measures are inadequate to address plaintiffs' ongoing harm.

Defendants highlight modifications to girls' restroom stalls with "privacy blinders." (ECF 22-2, ¶¶ 20-21; ECF 22-4). But F.F.'s second declaration reveals that no such changes have been made to girls' locker room stalls, where privacy issues are equally pressing. (ECF 23, Ex. 1, F.F. 2d Decl. ¶ 7). Even in the altered restrooms, photographs in Exhibit 4 of defendants' opposition (ECF 22-4) show that the restroom floor remains visible, and the stall doors, which do not reach the ceiling, permit someone standing nearby to look inside. (ECF 23, Ex. 1, F.F. 2d Decl. ¶ 8). These insufficient measures fail to mitigate the privacy violation F.F. experienced on November 4, 2024, when a male student could have viewed her undergarments or seen her through gaps in the stall. (F.F. 2d Decl. ¶ 3).

Further, the district court recounted F.F.'s assertion that she was denied access to a staff restroom by a librarian, highlighting the impracticability of defendants'

offered solution. (*Id.* at 3). When F.F. sought to use a staff restroom in the school library in January 2025, she was required to wait while staff allegedly verified her access, forcing her to leave in frustration. (ECF 23, Ex. 1, F.F. 2d Decl. ¶ 6). The librarian's assertion that she "never denied" F.F. access (ECF 22-3, ¶ 6), while perhaps technically accurate in that she may not have explicitly refused access, overlooks the impact of this delay, which effectively deterred F.F. from utilizing the option. This experience, coupled with F.F.'s apprehension about the stigma associated with using staff-only facilities (ECF 23, Ex. 1, F.F. 2d Decl. ¶ 5), underscores defendants' failure to offer viable alternative solutions.

This Court has held that remedies are inadequate if they are "seriously deficient as compared to the harm suffered." *Foodcomm Int'l*, 328 F.3d at 304. In *Whitaker*, the court found alternative restrooms inadequate because they were not conveniently located and drew unwanted attention to the transgender status of the plaintiff in that case. 858 F.3d at 1045. Similarly, here, the alternative restrooms offered to F.F. are insufficient because they are not consistently accessible and require plaintiffs to disrupt their education to reach them. (ECF 27, Mem. Op. at 3–4.) The installation of rubber strips does not eliminate the risk of exposure or F.F.'s resulting anxiety, particularly given her experience of encountering a student she perceived as male in a

female restroom. (*Id.* at 2). These deficiencies underscore the irreparable nature of harm suffered by plaintiffs, which cannot be fully rectified without injunctive relief.

## VIII. The Balance of Equities and Public Interest Favors an Injunction.

The district court abused its discretion in finding that the balance of equities and public interest weigh against an injunction. (ECF 27, Mem. Op. at 14–16). When constitutional and statutory rights are violated, the public interest favors injunctive relief. *See Joelner*, 378 F.3d at 620. Protecting female students' privacy and safety in school facilities serves a compelling public interest, especially given the policy's impact on over 1,600 female students. (ECF 1, Compl. ¶ 29). Defendants face minimal harm from an injunction; they can easily make available single-use gender-neutral facilities to students with non-conforming gender preferences. (ECF 12, Pls.' Mot. at 2; ECF 27, Mem. Op. at 15). The district court's conclusion that an injunction would disrupt defendants' compliance with state guidance (ECF 27, Mem. Op. at 15) grossly overstates the harm, given that non-binding state guidance cannot override federal constitutional and statutory protections. The balance tips decisively in plaintiffs' favor.

## CONCLUSION

For the foregoing reasons, the district court's denial of plaintiffs' motion for a preliminary injunction was an abuse of discretion that warrants reversal. The district court erred in accepting defendants' conclusory "transgender" label without requiring objective criteria, relying on non-binding guidance from the Illinois Department of Human Rights, misinterpreting this Court's precedent as granting schools unfettered discretion, and mischaracterizing F.F.'s privacy concerns as solely sexual in nature.

These errors led to flawed conclusions that defendants' policy—permitting biological males to access female-only restrooms, locker rooms, changing rooms, and showers based solely on self-declared gender preferences—does not violate the Equal Protection Clause or Title IX, causes no irreparable harm, is mitigated by adequate remedies, and outweighs the public interest in an injunction. The policy's arbitrary implementation, as evidenced by F.F.'s distressing encounter on November 4, 2024, and its impact on over 1,600 female students, inflicts ongoing privacy violations and educational disruptions that cannot be remedied without injunctive relief. (ECF 12, Ex. 1, F.F. Decl. ¶¶ 3, 10; ECF 1, Compl. ¶ 29).

Plaintiffs respectfully request that this Court reverse the district court's order, grant the preliminary injunction, and remand with instructions to enjoin defendants' policy until such time as defendants can formulate and publish objective criteria

49

governing access to sex-segregated facilities by members of the opposite biological sex. In the meantime, defendants should make available single-use gender-neutral facilities for students with non-conforming gender preferences to balance the rights of all students while safeguarding female students' privacy and safety.

Dated: October 15, 2025                    Respectfully submitted,

/s/ Ajay Gupta
Ajay Gupta
The Law Offices of Ajay Gupta
2849 Bond Circle
Naperville, Illinois 60563
(630) 854-7194
ajguptaemail@gmail.com

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for plaintiffs-appellants, furnishes the following in compliance with Federal Rule of Appellate Procedure 32(a)(7):

1. I hereby certify that the foregoing brief complies with the requirements set out in Federal Rule of Appellate Procedure 32(a)(7) for a brief prepared in a proportionally spaced typeface.

2. The foregoing brief has been prepared in a proportionally spaced typeface using Microsoft Word, Goudy Old Style, 14 point.

3. Exclusive of the table of contents, table of citations, and this certificate of compliance, the foregoing brief contains <u>10,187</u> words.

4. I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions. If the Court so directs, I will provide an electronic version of the brief and a copy of the word or line printout.

<u>/s/ Ajay Gupta</u>
Ajay Gupta
The Law Offices of Ajay Gupta
2849 Bond Circle
Naperville, Illinois 60563
(630) 854-7194
ajguptaemail@gmail.com

*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF SERVICE**

I certify that, on October 15, 2025, I electronically filed this Brief and Required Short Appendix of Plaintiffs-Appellants with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<div style="margin-left: 50%;">

/s/ Ajay Gupta
Ajay Gupta
The Law Offices of Ajay Gupta
2849 Bond Circle
Naperville, Illinois 60563
(630) 854-7194
ajguptaemail@gmail.com

*Counsel for Plaintiffs-Appellants*

</div>

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), the undersigned, counsel of record for plaintiffs-appellants, certifies that all material required by Circuit Rule 30(a) and (b) are included in the attached Required Short Appendix.

/s/ Ajay Gupta
Ajay Gupta
The Law Offices of Ajay Gupta
2849 Bond Circle
Naperville, Illinois 60563
(630) 854-7194
ajguptaemail@gmail.com

*Counsel for Plaintiffs-Appellants*

# APPENDIX

# TABLE OF CONTENTS

Appendix Page

Memorandum Opinion and Order
2025.09.30 [ECF 27] ................................................................. App. 1

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| F.F., *a minor, by and through her next friend and father, JAMES ELLARD FISHER, individually and on behalf of all others similarly situated,* | ) ) ) | |
| | ) | Case No. 1:25-cv-09112 |
| Plaintiff, | ) | |
| | ) | Judge Sharon Johnson Coleman |
| v. | ) | |
| | ) | |
| VALLEY VIEW COMMUNITY UNIT SCHOOL DISTRICT 365U, | ) ) | |
| Defendant. | | |

## MEMORANDUM OPINION AND ORDER

James Ellard Fisher ("Mr. Fisher"), on behalf of his minor daughter, F.F. ("Plaintiff"), and all others similarly situated, brings a two-count Complaint against Defendant, Valley View Community Unit School District 365U ("Defendant" or "School"), alleging Defendant violated: (1) the Equal Protection Clause of the Fourteenth Amendment and (2) Title IX of the Education Amendments of 1972 by and through its policy of allowing transgender female students access to "female-only" spaces, including restrooms, locker rooms, changing rooms, and showers, without any "objective assessment" of gender dysphoria or "subjective manifestation" of female identity. Plaintiff seeks entry of a preliminary injunction ("PI") enjoining Defendant from enforcing their policy based solely on transgender students' self-declared gender preferences, instead of offering them single-use gender-neutral facilities as a less intrusive alternative. After considering the parties' briefing and their oral arguments held on September 17, 2025, the Court denies Plaintiff's PI Motion ("Motion")[12], for the reasons set forth herein.

## BACKGROUND

Plaintiff is a 17-year-old female student enrolled at Bolingbrook High School. On November 4, 2024, at around 10:00 a.m., Plaintiff entered a girls' multi-use restroom labeled "girls' bathroom." After using and exiting a stall, Plaintiff observed a transgender student, who she was familiar with, dressed in "male-typical clothing…with no visible indication of female identity," standing in close proximity to her stall. Plaintiff feared that the student could have seen her undergarments or her exposed body while she was disrobed through small spaces on either side or under the stall door. While Plaintiff does not allege any facts indicating the student actually saw or tried to see her exposed body, Plaintiff claims to have been "triggered" and to have experienced "intense feelings of anxiety, discomfort, and shame" from the mere possibility of being exposed.

On November 6, 2024, Plaintiff described the incident to her father, Mr. Fisher. The following day, Mr. Fisher sent a text message to the School's principal, Dr. Pascavage, to report the incident and raise concerns about Plaintiff's privacy. Dr. Pascavage responded that the transgender female student had been granted access to the girls' restroom pursuant to an Individual Development Plan, or formal plan outlining the student's gender-identity accommodations. To address Plaintiff's privacy concerns, Dr. Pascavage offered Plaintiff access to single-use staff restrooms.

During an in-person meeting with Mr. Fisher on November 12, 2024, Dr. Pascavage further elaborated that the School followed Illinois Department of Human Rights ("IDHR") guidance, titled "Guidance on Protection of Students in Illinois: A Non- Regulatory Guidance Relating to Protection of Transgender, Nonbinary, and Gender Nonconforming Students.[1]" The 2021 IDHR publication

---

[1] Illinois Department of Human Rights, "Non- Regulatory Guidance Relating to Protection of Transgender, Nonbinary, and Gender Nonconforming Students Under the Illinois Human Rights Act," https://dhr.illinois.gov/content/dam/soi/en/web/dhr/publications/documents/idhr-guidance-relating-toprotection-of-transgender-nonbinary-and-gender-nonconforming-students-eng-web.pdf (last visited September 30, 2025).

App. 2

provides guidelines on complying with the Illinois Human Rights Act, 775 ILCS 5/5-101 et seq. ("IHRA"), "in the context of a school setting, with specific focus on how the IHRA protects the rights of transgender, nonbinary, and gender nonconforming individuals." In relevant part, the publication states:

> Use of restrooms, locker rooms and changing rooms may not be restricted based upon a student's physical anatomy or chromosomal sex. A student must be permitted to access restrooms or bathrooms, locker rooms and changing rooms that align with their gender-related identity and *without having to provide documentation or other proof of gender.*

> Under the Act, the discomfort or privacy concerns of other students, teachers, or parents are not valid reasons to deny or limit the full and equal use of facilities based on a student's gender-related identity. Instead, any student, teacher or other individual *seeking more privacy should be accommodated by providing that individual a more private option upon their request, if possible.* The prejudices of others are part of what the [Act] was meant to prevent. [T]here is no right that insulates a student from coming in contact with others who are different.

*Id.* at 6-7 (emphasis added). During continued communication with Dr. Pascavage throughout November 2024, Mr. Fisher expressed frustration with the School's policy and complained that the School's offer to allow Plaintiff's use of an alternative facility, would not sufficiently address the issue.

On December 9, 2024, at a public meeting of the School District's Board of Education, Mr. Fisher raised the issue of transgender students having access to the girls' restrooms, drawing attention to gaps on the sides and below stall doors that render the interior of the stall partially visible from outside. In response to Mr. Fisher's concerns about the stall design, between December 20, 2024, and January 6, 2025, the School installed rubber strips and other opaque material on the toilet stalls in the girls' restrooms.

In January 2025, Plaintiff attempted to use the staff restroom in the School's library to avoid running into a transgender student in a girls' restroom. Plaintiff alleges, however, that she was denied access to the staff restroom by the librarian. Discouraged, Plaintiff took deliberate care to use other girls' restrooms in the School as far away as possible from the one where the initial "incident"

3

App. 3

occurred. Further, Plaintiff used these girls' restrooms only during class hours, which she alleges led to her losing classroom instruction time, disrupted her routine, heightened her unease, and diminished her sense of safety at the School. She further claims that this fear caused her to skip restroom visits, which Plaintiff states was "especially unsettling" during the days she had her period. Plaintiff does not allege, however, that she confirmed or investigated the gender identity of any other girls she encountered in the restroom outside of the transgender girl she was familiar with from the initial "incident."

In response to Plaintiff's distress, on March 20, 2025, Mr. Fisher filed a formal Title IX complaint with the School District's Title IX Coordinator, Sarah DeDonato. The complaint alleged that due to Plaintiff's encounter with a transgender female student in a girls' restroom, Plaintiff was discriminated against and harassed based on her sex. On June 23, 2025, Dr. Teresa Polson, the School District's Assistant Superintendent for Educational Services, sent Mr. Fisher a final decision letter via certified mail and email, rejecting Plaintiff's Title IX complaint, again citing the IDHR's guidance regarding the rights of transgender, nonbinary, and gender nonconforming individuals in a school setting and further stating that the privacy concerns articulated by Plaintiff were "purely speculative and not based on fact."

Dissatisfied with the outcome of her Title IX complaint, Plaintiff filed the present action on August 1, 2025, followed by a motion for a temporary restraining order ("TRO") and PI (Dkt. 12). On August 13, 2025, the Court denied the TRO (Dkt. 13), stating that "Plaintiff's representations in her motion do not demonstrate that Plaintiff is under threat of such immediate harm necessitating extraordinary relief through issuance of a temporary restraining order" and setting a briefing schedule for Plaintiff's PI Motion. The Motion is now fully briefed before this Court.

**LEGAL STANDARD**

The standards for issuing a TRO are identical to those for a PI. *Gray v. Orr*, 4 F. Supp.3d 984, 989 n.2 (N.D. Ill. 2013) (Durkin, T.). Both are "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020) (citation omitted). A party seeking a PI must first demonstrate: (1) likelihood of success on the merits; (2) that irreparable harm is likely in the absence of the PI; and (3) that there is no adequate remedy at law. *See Turnell v. Centimark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015); *Cassell*, 990 F.3d at 544-45. If the moving party fails to demonstrate any one of these three threshold requirements, the Court must deny the motion. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). Even if the moving party makes this threshold showing, the Court then exercises considerable discretion in balancing the harm between the parties and the effect on the public interest in determining the motion. *Tully v. Okeson*, 977 F.3d 608, 613 (7th Cir. 2020); *Cassell*, 990 F.3d at 545.

**DISCUSSION**

    A. <u>Likelihood of Success on the Merits</u>

        *1. Equal Protection Claim*

Plaintiff asserts that the Defendant's policy, which accommodates transgender female students in multi-use sex-segregated spaces discriminates against "female" students because it denies them the use of secure sex-segregated spaces free from intrusion by "males." (Dkt. 12 at *4). For a showing of likelihood of success on the merits, a plaintiff must show more than a "mere possibility of success." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). Rather, a plaintiff must make a strong showing that they will likely succeed on the merits of their claims. *See id.* Plaintiff has failed to make any such showing.

The Equal Protection Clause ("Clause") mandates that individuals in similar circumstances be treated equally. *City of Cleburne v. Cleburne Living Ctr.*, 105 S.Ct. 3249, 3254 (1985). The Clause prohibits

intentional and arbitrary discrimination. *See Vill. of Willowbrook v. Olech*, 120 S.Ct. 1073, 1075 (2000) (per curiam). Typically, state actions are presumed valid and upheld if the classification is rationally related to a legitimate state interest. *City of Cleburne*, 473 U.S. at 3254. This rational-basis standard, however, does not apply to sex-based classifications. *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1050 (7th Cir. 2017). Instead, for a sex-based classification, the state bears the burden of proving an "exceedingly persuasive" justification, must demonstrate that the classification advances important governmental objectives, and that the discriminatory methods are substantially related to achieving those objectives. *United States v. Virginia*, 116 S.Ct. 2264, 2275 (1996).

Plaintiff argues that Defendant's policy to accommodate transgender female students in spaces previously reserved for the exclusive use of "female" students, qualifies as sex-based discrimination. (*See* Dkt. 12 at *4). Plaintiff also argues that Defendant's policy disproportionately harms "female" students, who must "endure privacy violations or seek burdensome alternatives, such as staff restrooms, thereby disrupting their education." (*See id.* at *7). Plaintiff concludes that Defendant's policy fails heightened scrutiny, since it offers no important governmental objective for allowing transgender female students access to "female" spaces without evidence of female gender identity and any basis in a recognized social or biological construct of sex. (*See id.* at *7-8).

Defendant, however, asserts that its policy does not include a sex-based classification and notes that, as pled by Plaintiff, the framework for Defendant's restroom access comes directly from the IDHR' gender-neutral guidance that "[a] student must be permitted to access restrooms or bathrooms, locker rooms and changing rooms that align with their gender related identity [...]. (*See* Dkt. 22 at *6). Defendant also argues Plaintiff's contention, that female students are disproportionately hurt by this guidance, is unpersuasive as it is clear that all students are allowed access to the restroom that aligns with their gender identity. (*Id.*). Importantly, Defendant asserts all students, Plaintiff included, are allowed access to the restroom that aligns with their gender identity,

6

App. 6

not just transgender women—any other interpretation would ignore the fact that transgender men, cisgender men, and cisgender women are all guaranteed the same accommodations as transgender women. (*Id.*).

The Court agrees with Defendant that its policy does not constitute sex-based discrimination like the policies deemed unconstitutional by the Seventh Circuit in *Whitaker* and *Martinsville* because *ALL* students, regardless of gender, are permitted access to facilities that align with their gender identity. Plaintiff's reliance on *Whitaker* and *Martinsville* is erroneous, as those cases, which required students to use the gender-specific restroom matching their birth certificate, included sex-based classifications regarding transgender students, and treated transgender students who failed to conform to the sex-based stereotypes, differently on the basis of their transgender status. *See generally Whitaker*, 858 F.3d 1034; *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023). Here, Defendant's existing policy is gender neutral and does not treat transgender students differently on the basis of their transgender status. Defendant allows every student, regardless of gender, to utilize the facility consistent with their gender identity, and, importantly, does not include any sex-based classification that triggers the heightened scrutiny analysis found in *Whitaker* and *Martinsville.*

Perplexingly, Plaintiff asks this Court to enter an order that resembles the policies already found to be unconstitutional in *Whitaker* and *Martinsville* by requiring Defendant to adopt a policy based on "objective criteria" like medical documentation and gender identity that would explicitly result in the disparate treatment of transgender students. Any policy based on medical documentation of biological gender would run afoul to the rulings in *Whitaker* and *Martinsville* and any policy requiring medical documentation of gender identity would be contrary to the IDHR's guidance, which states that all students *MUST* be permitted access to facilities that align with their gender-related identity "without having to provide documentation or other proof of gender." IDHR, *supra* note 1 at 7. As Defendant emphasizes, Plaintiff fails to acknowledge that Defendant's policy is inclusive of all

App. 7

genders, which contrasts the exclusive policies in *Whitaker* and *Martinsville* that included sex-based disparate treatment of transgender students and were found unconstitutional by the Seventh Circuit.

While *Whitaker* and *Martinsville* are still binding authority on this Court, the Court acknowledges that the recent Supreme Court opinion in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), has caused the Seventh Circuit to reconsider their holdings in those cases. In *Skrmetti* the Supreme Court found that a Tennessee law ("SB1") prohibiting certain medical treatments for transgender minors was not subject to heightened scrutiny because the law did not prohibit conduct for one sex that it permits for the other. *Id.* at 1831. Under SB1, no minor can be administered puberty blockers or hormones to treat gender dysphoria, gender identity disorder, or gender incongruence and minors of any sex can be administered puberty blockers or hormones for other purposes. *Id.* Here, Defendant's policy, similarly, does not prohibit conduct for one sex, namely the use of specific restrooms, that it permits for other since *ALL* students are permitted to use the restroom that aligns with their gender identity.

Furthermore, even if this new precedent calls into question whether policies that target and disproportionally affect transgender students are still subject to intermediate scrutiny, the outcome of the likelihood of success on the merits analysis remains the same since Defendant's inclusive policy does not prohibit conduct for one sex that it permits for the others. Importantly, even if it did, it would be given even more deference under rational basis review. The relaxed rational basis inquiry requires a court to uphold a statutory classification so long as there is "any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Communications, Inc.*, 113 S.Ct. 2096, 2101 (1993). Where there exist "plausible reasons" for the relevant government action, "our inquiry is at an end." *Id.*; *Skrmetti,* 145 S. Ct. at 1835.

Defendant's inclusive policy—which is consistent with State and Federal law, allows transgender students access to the restrooms aligning with their gender identity, and provides

App. 8

alternative facilities for individuals with privacy concerns—is definitively gender neutral and easily overcomes rational basis inquiry if not.[2]  For these reasons, the Seventh Circuit's rehearing of *Whitaker* and *Martinsville*, in light of *Skrmetti*, does not affect this Court's ruling.

Ultimately, because Defendant's policy is gender neutral as to all students, Plaintiff's Equal Protection claim is unlikely to succeed on the merits.

### 2. *Title IX Claim*

The Court now moves to Plaintiff's Title IX Claim.  Plaintiff argues Defendant intentionally discriminates against "female students" by subjecting them to the constant risk of encountering transgender female students in "female-only" spaces, causing anxiety, humiliation, and educational disruption.  (*See* Dkt. 12 at *9).  Title IX provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance [...]" 20 U.S.C. § 1681(a).  Plaintiff, again, fails to make a showing that Defendant engaged in discrimination on the basis of sex.

Plaintiff argues the Seventh Circuit's rulings in *Whitaker* and *Martinsville*—where transgender students were discriminated against by their respective schools' policies that deny them access to facilities matching their gender identity—apply inversely here: Plaintiff and the proposed class face discrimination because Defendant's policy forces them to share facilities with "biological males" based solely on self-declared preferences and without objective criteria like medical documentation and gender identity.  (*See* Dkt. 12 at *10).  Plaintiff further argues that, unlike the transgender students in *Whitaker* and *Martinsville*, who provided medical record evidence and consistent gender expression, the

---

[2] *Contrast Romer v. Evans*, 116 S. Ct. 1620, 1623 (1996)(where the "sheer breadth" of an exclusionary law which makes a general announcement that gays and lesbians shall not have any particular protections from the law was "so discontinuous with the reasons offered for it that the [law] seem[ed] inexplicable by anything but animus toward the class it affect[ed]").

student Plaintiff encountered in the girls' restroom, in her subjective opinion, exhibited no signs of female gender acknowledgement or expression. (*Id.*).

By contrast, Defendant argues Plaintiff's claim fails for multiple reasons. First, because Plaintiff fails to show that Defendant's inclusive policy leads to disparate treatment, she cannot prove she is subjected to any sex-based discrimination. (Dkt. 22 at *7). Second, because Plaintiff's Title IX theory is not focused on her own access to the restroom, but instead focuses on the proposed exclusion of transgender female students from facilities based on "privacy concerns," her theory should be rejected like the Seventh Circuit's rejections of such "conjectural" "privacy concerns" in both *Whitaker* and *Martinsville*. (*Id.* at *8). And third, Plaintiff's argument that the use of medical records in *Whitaker* and *Martinsville* created a method for how students should prove their gender misconstrues the rulings of these cases as the medical records were offered to support each plaintiff's preliminary injunction motion based on their medically documented diminished well-being in response to the respective schools' policies, not to prove their gender. (*See Id.* at *8).

The Court agrees with Defendant that Plaintiff has not shown that Defendant's policy violates Title IX since its policy guarantees all students equal rights provided under the statute. The Seventh Circuit has held that policies denying students access to facilities consistent with their gender identity can constitute sex-based discrimination under Title IX, particularly when such policies rely on sex-stereotyping or failing to account for a student's transgender status. *Whitaker*, 858 F.3d at 1048–50; *Martinsville*, 75 F.4th at 769–70. Specifically, the Seventh Circuit in *Martinsville* determined that a bathroom policy relying on biological sex to address "privacy concerns" for cisgender students, violates Title IX because a transgender students' presence in their gender affirming bathroom "did not threaten those privacy interests" and because "gender-affirming access policies neither thwart rule enforcement nor increase the risk of misbehavior in bathrooms and locker rooms." *See Martinsville*, 75 F.4th at 773-774.

Applying these cases inversely and allowing for disparate gender identification policies, would lead to the exact unconstitutional scenario the Seventh Circuit rebuked in both *Whitaker* and *Martinsville*: a ban on transgender students' access to restrooms that align with their gender identity. Plaintiff's desire to improperly rely on sex stereotyping, is evidenced by her Counsel's oral argument suggesting the transgender student's wearing of "male clothing," or baggy clothes, "obviously" meant she could not identify as female—despite baggy clothes being a common style worn by teenagers across all genders. Plaintiff's claim does not allege that she faced disparate treatment. Instead, Plaintiff asks this Court to enter an order that disparately treats all transgender students based on a singular, speculative conclusion that the student she encountered in the bathroom is not female. Doing so would be wholly contrary to precedent. Accordingly, Plaintiff cannot show a likelihood of success on her Title IX Claim.

### B. Showing of Irreparable Harm

Next the Court will evaluate Plaintiff's assertion that she will face irreparable harm absent injunctive relief for both of her claims. *See Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 787 (7th Cir. 2011). Plaintiff argues that she has met this burden by asserting that she and the proposed class suffer continuous harm from Defendant's policy which forces them to navigate restrooms with compromised privacy, leading to unease, embarrassment, anguish, and interference with learning. (Dkt. 12 at *10-11).

A showing of irreparable harm requires more than a mere possibility of harm. *Michigan*, 667 F.3d 765 at 788. Harm is considered irreparable if it "cannot be prevented or fully rectified by the final judgment after trial." *Girl Scouts*, 549 F.3d at 1089. In determining whether irreparable harm is satisfied, plaintiffs must show that no adequate legal remedy is available to cure the harm. *Life Spine Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021). "Inadequate does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered." *Id.*

Plaintiff argues that her reported anxiety and forced bathroom behavioral changes mirror the harm deemed irreparable in *Whitaker* and *Martinsville* and argues Defendant's inadequate modifications to restroom stalls and its refusal to restrict transgender female students from accessing "female" facilities, guarantee that this harm remains significant and ongoing. (Dkt. 11 at *7). Plaintiff concedes, however, that in *Martinsville*, the Seventh Circuit rejected the school district's privacy-based justification for denying gender-affirming facility access, finding them "entirely conjectural." (*Id.* at *11).

This Court does not believe the harm Plaintiff articulates rises to the level of irreparable harm outlined in *Whitaker* and *Martinsville*. Plaintiff's fears are not based on any stigmatization stemming from gender dysphoria or additional attention that comes from being othered. *Contrast Martinsville*, 75 F.4th 760 at 764, 767(where plaintiff described that being excluded from the boys' restrooms worsened the "significant distress, depression, and anxiety" caused by his gender dysphoria and that "using the remote unisex bathroom drew undesirable attention to his transgender status."). Plaintiff also does not allege suicidal ideation and diminished wellbeing from Defendant's exclusionary treatment or make a clear showing that the alternative bathrooms Defendant provided were located far from her classrooms like the plaintiff in *Whitaker* alleged. *Contrast Whitaker*, 858 F.3d at 1045 (where plaintiff described "thoughts of suicide" in response to his school's exclusionary policies and where the "record demonstrate[d] that [alternative] bathrooms were not located close to [plaintiff's] classrooms."). Instead, Plaintiff's fear of harm from merely encountering a transgender student in the classroom, is similar to the "entirely conjectural" reasoning rejected in *Martinsville*. *See Martinsville*, 75 F.4th at 772–73. Her reported distress is particularly suspect as it relies on Plaintiff's subjective determination that a transgender female student did not meet the gender stereotypes of a girl and that her presence in the bathroom, without incident, created an inherent privacy concern.

12

Nonetheless, despite the insufficient nature of Plaintiff's alleged privacy concerns, Defendant has taken great care to address Plaintiff's concerns. Specifically, notwithstanding the complete lack of requirement that Defendant take any action whatsoever, the School added blinders to the restroom stall doors to reduce the amount of visible space between the door and the stall and offered the student access to numerous private restrooms, always within 100 feet of her classrooms. Defendant's offerings were in accordance with IDHR guidance, which states any student, teacher or other individual "seeking more privacy should be accommodated by providing that individual a more private option upon their request, if possible," even though "there is no right that insulates a student from coming in contact with others who are different." IDHR, *supra* note 1 at 7. Defendant's accommodation of a private bathroom went beyond what Defendant is required by law to provide. Finally, unlike the plaintiffs in *Whitaker* and *Martinsville*, Plaintiff has not provided proof of diminished well-being in support of her allegations, further solidifying that she cannot make a showing that she will suffer irreparable harm absent her requested relief. To find irreparable harm based on one individual's singular, speculative opinion could result is very dangerous precedent, especially where Plaintiff failed to allege actual, substantive facts to support her conclusion that the individual was not transgender, other than reference her "male clothing."

C.   Alternative Remedies Available to Plaintiff

The final consideration in the threshold analysis is to determine whether adequate remedies at law exist in absence of the requested relief. *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002). This requires a showing that any award would be "seriously deficient as compared to the harm suffered." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003). Plaintiff argues "[t]he resulting psychological and educational toll [of feeling like she does not have privacy in the sex-specific female restroom] constitutes irreparable injury, [and states that] monetary damages cannot restore lost privacy, safety, or educational opportunities." (Dkt. 12 at *11).

13

As outlined above in the Court's ruling on irreparable harm, this Court does not believe Plaintiff has established that her alleged harm, undiagnosed anxiety, cannot be remedied through other means. This type of alleged, undocumented emotional distress does not rise to the level of the harm pled by a transgender student in *Whitaker,* which involved claims of possible suicide and life-long diminished well-being and functioning, where the Seventh Circuit found that such harm could not be remedied by monetary damages. *See Whitaker*, 858 F.3d at 1046. Because Plaintiff has not demonstrated that her undiagnosed emotional condition cannot be remedied through alternative means, or that her privacy concerns cannot be remedied by the modifications already offered by Defendant, or by way of access to private facilities, Plaintiff fails to show that no adequate remedies at law exist.

### D. Balance of Equities and the Public Interest

Finally, the Court considers the balance of equities between the parties and the effect on the public interest. Before ruling on an injunction request, courts are required to "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Resources Defense Council, Inc.*, 129 S.Ct. 365, 377 (2008). This includes "particular regard for the public consequences" should the preliminary injunction be issued. *Id.* This analysis is a "subjective and intuitive one which permits district courts to weigh the competing considerations and mold appropriate relief." *Ty, Inc. v. Jones Group*, Inc., 237 F. 3d 891, 896 (7th Cir. 2001).

Plaintiff argues the balance of equities strongly favor Plaintiff since Defendant's policy inflicts significant harm on female students by compromising their privacy and safety. (Dkt. 12 at *12). Plaintiff similarly argues that an injunction would serve the public interest since Defendant's policy undermines the public's interest in safe and equitable educational environments, particularly for female students facing discrimination. (*Id.* at *13). Plaintiff further asserts that the non-regulatory guidance

14

App. 14

from the IDHR that Defendant relies upon in developing its gender-affirming policy, lacks the force of law, and even if it did have the force of law, should be considered presumptively invalid. (*Id.* at *14). Plaintiff ultimately argues the balance of equities weigh in her favor because Defendant would face "minimal hardship" implementing single-use gender-neutral facilities for transgenders students. (*See* Dkt. 12 at *12). Plaintiff does not address, however, the hardship Defendant would face, or the privacy violations transgender students would face, if Defendant were forced to confirm students' biological sex and genitalia based on onlookers' subjective determinations that an individual does not have the "correct" gender identity to be in a specific sex segregated space.

By contrast, Defendant contends the balance of equity weighs in its favor because the injunctive relief Plaintiff requests the Court to endorse is the exact scheme that has regularly been found unconstitutional; such a ruling would expose Defendant to legitimate lawsuits from every transgender student wishing to use the restroom best aligned with their respective gender identity, which, in and of itself, places the balance of equities in favor of Defendant. (Dkt. 22 at *12). Defendant similarly argues the public interest is best served by allowing it to continue complying with IDHR guidance during the pendency of this litigation to avoid an influx of administrative complaints and lawsuits that would ensue from adopting Plaintiff's proposed policy, that has already been found unconstitutional by the Seventh Circuit. (*Id.* at 18).

At this stage, it is clear the balance of equities and public interest weigh in favor of Defendant's position. Relevant here, *Whitaker* emphasizes that that hypothetical concerns about a policy that permits a student to utilize a bathroom consistent with his or her gender identity have not materialized, and, importantly, that adopting an inclusive policy that allows transgender students to use facilities that align with their gender identity best serves the needs of students. *Whitaker*, 858 F.3d at 1055. While the Seventh Circuit in *Martinsville* acknowledged the importance of individual privacy interest to the public, it determined a that a transgender student's use of a facility consistent with their gender

15

identity does not threaten those privacy interests. *Martinsville*, 75 F.4th at 774. Such principles apply here. Defendant's policy should not be displaced since it complies with state and federal guidance, best serves the needs of students, and does not create privacy concerns—especially where the alleged evidence of harm caused by the transgender student at issue is wholly unsupported. *See id.* (stating that plaintiff's claims of harm were unsupported when students were granted gender-affirming accommodations without incident over the course of a year).

The balance of equities and public interest are best served by denying the Motion.

**CONCLUSION**

Accordingly, the Court denies Plaintiff's Motion for a Preliminary Injunction [12].

IT IS SO ORDERED.

Date: 9/30/2025

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge

16